**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 14-1101**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————

HEALTHBRIDGE MANAGEMENT, LLC, ET AL.,

*Petitioners*,

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent*.

————————

**On Petition for Review of Decision and Order
of the National Labor Relations Board**

————————

**OPENING BRIEF FOR PETITIONER
HEALTHBRIDGE MANAGEMENT, LLC, ET AL.**

————————

PAUL D. CLEMENT
ERIN E. MURPHY
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Petitioners HealthBridge Management, LLC, et al.*

October 16, 2014

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Petitioners hereby provide this certificate as to parties, rulings, and related cases, which includes the disclosure required by Circuit Rule 26.1.

### A.    Parties and *Amici*

Petitioners are HealthBridge Management, LLC, 107 Osborne Street Operating Co. II, LLC d/b/a Danbury HCC; 710 Long Ridge Road Operating Co. II, LLC d/b/a Long Ridge of Stamford; 240 Church Street Operating Co. II, LLC d/b/a Newington Health Care Center; 1 Burr Road Operating Co. II, LLC d/b/a Westport Health Care Center; 245 Orange Avenue Operating Co. II, LLC d/b/a West River Health Care Center; 341 Jordan Lane Operating Co. II, LLC d/b/a Wethersfield Health Care Center, and Care Realty, LLC.

HealthBridge Management, LLC, is 100% owned by Care One, LLC, and no publicly held company has a 10% or greater ownership interest in Care One, LLC. Petitioners 107 Osborne Street Operating Co. II, LLC d/b/a Danbury HCC; 710 Long Ridge Road Operating Co. II, LLC d/b/a Long Ridge of Stamford; 240 Church Street Operating Co. II, LLC d/b/a Newington Health Care Center; 1 Burr Road Operating Co. II, LLC d/b/a Westport Health Care Center; 245 Orange Avenue Operating Co. II, LLC d/b/a West River Health Care Center; and 341 Jordan Lane Operating Co. II, LLC d/b/a Wethersfield Health Care Center are 100% owned by Care Realty,

LLC. No publicly held company has a 10% or greater ownership interest in any of the entities identified above.

Respondent is the National Labor Relations Board (NLRB).

No other entities have sought to participate as intervenors or *amici curiae* in this case.

### B.  Rulings Under Review

Petitioners seek review of the decision and order entered by Respondent National Labor Relations Board on May 22, 2014, in Case 34-CA-012964 and 34-CA-013064, reported as *HealthBridge Management, LLC; 107 Osborne Street Operating Co. II, LLC d/b/a Danbury HCC; 710 Long Ridge Road Operating Co. II, LLC d/b/a Long Ridge of Stamford; 240 Church Street Operating Co. II, LLCd/b/a Newington Health Care Center; 1 Burr Road Operating Co. II, LLC d/b/a Westport Health Care Center; 245 Orange Avenue Operating Co. II, LLC d/b/a West River Health Care Center; 341 Jordan Lane Operating Co. II, LLC d/b/a Wethersfield Health Care Center and New England Health Care Employees Union District 1199, SEIU, AFL-CIO and Care Realty, LLC*, 360 N.L.R.B. No. 118.

### C.  Related Cases

This matter has not previously been before this Court or any other court. There is a related case, *HealthBridge Management, Care Realty (a/k/a CareOne), et*

*al.*, Case 34-CA-012715, which is pending before the National Labor Relations Board.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............... i

TABLE OF AUTHORITIES.................................................................... vi

GLOSSARY OF ABBREVIATIONS ..................................................... ix

JURISDICTIONAL STATEMENT ......................................................... 1

STATUTES AND REGULATIONS ........................................................ 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE................................................................. 2

    A.    Factual Background.................................................... 2

    B.    The Complaint and the Administrative Hearing ................................. 7

    C.    The Decision of the Administrative Law Judge................................ 10

    D.    Decision of the Board........................................................ 12

SUMMARY OF ARGUMENT................................................................ 14

STANDARD OF REVIEW ................................................................... 17

STANDING.................................................................................... 18

ARGUMENT .................................................................................. 19

I.    Petitioners Did Not Violate The NLRA By Prohibiting Employees From Wearing The "BUSTED" Sticker In Immediate Resident-Care Areas .................................................................................. 19

    A.    Under Long-Settled Law, Restrictions on Insignia in Patient-Care Areas of Healthcare Facilities Are Presumptively Valid .......... 20

    B.    Petitioners' Policy Toward the "BUSTED" Sticker Was Entirely Consistent With the Law That Governed at the Time .......... 23

    C.    The Board's New "All or Nothing" Approach Toward Insignia Restrictions Is Neither Legally Nor Factually Sustainable........................................................................ 25

D. The Board's "Special Circumstances" Analysis Cannot Be Reconciled With This Court's Cases or the Uncontroverted Facts ........................................................................................... 33

II. Petitioners Did Not Violate The NLRA By Removing A Derogatory And Disparaging Flyer From Bulletin Boards On Which The Union Was Permitted To Post Only "Proper Union Notices." ............................... 38

A. An Employer Has a Right To Ban or Limit Access to Its Own Bulletin Boards ................................................................... 38

B. Petitioners Were Enforcing a Neutral Policy, Not Discriminating Against the Union, When They Removed the "BUSTED" Flyers ............................................................ 40

C. The Board's Conclusion That Petitioners' Actions Violated Section 8(a)(1) Is Legally Flawed and Factually Unfounded ............ 42

D. The Board's Remarkable Finding That the "BUSTED" Flyer Was Not Inaccurate, Derogatory, or Inflammatory Is Indefensible ............................................................................. 44

CONCLUSION ..................................................................................... 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998)........................................................18

*\*Baylor University Medical Center v. NLRB*,
  662 F.2d 56 (D.C. Cir. 1981) ............................... 22, 34, 35

*\*Beth Israel Hosp. v. NLRB*,
  437 U.S. 483 (1978)...................................... 20, 21, 22, 27, 28, 35, 37

*Beverly Health & Rehab. Servs., Inc. v. NLRB*,
  317 F.3d 316 (D.C. Cir. 2003) ...........................................42

*Brockton Hosp. v. NLRB*,
  294 F.3d 100 (D.C. Cir. 2002) ...........................................34

*Casa San Miguel, Inc.*,
  320 N.L.R.B. 534 (1995)................................................21

*Container Corp. of Am.*,
  244 N.L.R.B. 318 (1979)................................................39

*Eaton Techs., Inc., A Fasco Co.*,
  322 N.L.R.B. 848 (1997)...............................................4, 39

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012)................................................33

*Guardian Indus. Corp. v. NLRB*,
  49 F.3d 317 (7th Cir. 1995)..............................................38

*Helton v. NLRB*,
  656 F.2d 883 (D.C. Cir. 1981) .........................................40

*\*In re Stevens Graphics, Inc.*,
  339 N.L.R.B. 457 (2003) ................................... 39, 43, 46

---

*Authorities on which this brief chiefly relies are marked with an asterisk.

*Liquor Salesmen's Union v. NLRB*,
   664 F.2d 1200 (D.C. Cir. 1981) ........................................................18

*\*Loparex LLC v. NLRB*,
   591 F.3d 540 (7th Cir. 2009)................................................ 40, 43, 47

*Mid-Mountain Foods, Inc. v. NLRB*,
   269 F.3d 1075 (D.C. Cir. 2001) ........................................................39

*Monongahela Power Co.*,
   314 N.L.R.B. 65 (1994) ....................................................................45

*N.Y. & Presbyterian Hosp. v. NLRB*,
   649 F.3d 723 (D.C. Cir. 2011)...........................................................18

*\*NLRB v. Baptist Hosp.*,
   442 U.S. 773 (1979)................................. 13, 18, 20, 22, 25, 27, 34, 35

*NLRB v. Motorola, Inc.*,
   991 F.2d 278, 283 (5th Cir. 1993)....................................................26

*NLRB v. U.S. Postal Serv.*,
   8 F.3d 832 (D.C. Cir. 1993) ....................................................... 42, 43

*Penn. Am. Water Co. & Util. Workers Union of Am.,*
   *Sys. Local No. 537, AFL-CIO*,
   359 N.L.R.B. No. 142 (June 28, 2013)...............................................39

*Republic Aviation Corp. v. NLRB*,
   324 U.S. 793 (1945)...........................................................................30

*Roll & Hold Warehouse & Distribution Corp.*,
   325 N.L.R.B. 41 (1997) ....................................................................45

*S & F Mkt. St. Healthcare LLC v. NLRB*,
   570 F.3d 354 (D.C. Cir. 2009) ..........................................................42

*S. Md. Hosp. Ctr. v. NLRB*,
   801 F.2d 666 (4th Cir. 1986)............................................................26

*Sacred Heart Med. Ctr.*,
   347 N.L.R.B. 531 (2006) ..................................................................34

*Saint John's Health Ctr. & Cal. Nurses Ass'n Nat'l Nurses Org. Comm.*,
    357 N.L.R.B. No. 170 (Dec. 30, 2011).................... 11, 26, 27, 28, 29, 30, 31, 32

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ............................................................18

*St. John's Hosp.*,
    222 N.L.R.B. 1150 (1976) ...............................................................3, 6

*Sutter E. Bay Hosps. v. NLRB*,
    687 F.3d 424 (D.C. Cir. 2012) ...........................................................21

*Titanium Metals Corp. v. NLRB*,
    392 F.3d 439 (D.C. Cir. 2004) ...........................................................18

*USC Univ. Hosp. & Nat'l Union of Healthcare Workers*,
    358 N.L.R.B. No. 132 (Sept. 17, 2012)...................................... 20, 21

*Verizon Tel. Cos. v. FCC*,
    269 F.3d 1098 (D.C. Cir. 2001) .........................................................32

*W. Summit Flexible Packaging*,
    310 N.L.R.B. 45 (1993) ............................................................... 43, 46

*Wash. State Nurses Ass'n v. NLRB*,
    526 F.3d 577 (9th Cir. 2008)...................................................... 19, 21

*Williams Natural Gas Co. v. FERC*,
    3 F.3d 1544 (D.C. Cir. 1993) .............................................................32

**Statutes**

29 U.S.C. § 157 ...................................................................................1

29 U.S.C. § 158 ...............................................................................2, 30

29 U.S.C. § 160(f)...............................................................................1

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ALJ | Administrative Law Judge |
| Board | National Labor Relations Board |
| Centers | 107 Osborne Street Operating Co. II, LLC d/b/a Danbury HCC; 710 Long Ridge Road Operating Co. II, LLC d/b/a Long Ridge of Stamford; 240 Church Street Operating Co. II, LLC d/b/a Newington Health Care Center; 1 Burr Road Operating Co. II, LLC d/b/a Westport Health Care Center; 245 Orange Avenue Operating Co. II, LLC d/b/a West River Health Care Center; and 341 Jordan Lane Operating Co. II, LLC d/b/a Wethersfield Health Care Center |
| CBA | Collective Bargaining Agreement |
| HealthBridge | HealthBridge Management, LLC |
| NLRA or Act | National Labor Relations Act |

## JURISDICTIONAL STATEMENT

The Board entered its Decision and Order on May 22, 2014. *See HealthBridge Management, LLC; 107 Osborne Street Operating Co. II, LLC d/b/a Danbury HCC; 710 Long Ridge Road Operating Co. II, LLC d/b/a Long Ridge of Stamford; 240 Church Street Operating Co. II, LLC d/b/a Newington Health Care Center; 1 Burr Road Operating Co. II, LLC d/b/a Westport Health Care Center; 245 Orange Avenue Operating Co. II, LLC d/b/a West River Health Care Center; 341 Jordan Lane Operating Co. II, LLC d/b/a Wethersfield Health Care Center and New England Health Care Employees Union District 1199, SEIU, AFL-CIO and Care Realty, LLC*, 360 N.L.R.B. No. 118 (May 22, 2014). Petitioners filed a timely petition for review in this Court on June 5, 2014, and an amended petition for review on July 9, 2014. This Court has jurisdiction under section 10(f), which provides that a person "aggrieved by a final order of the Board" may seek review in this Court. 29 U.S.C. § 160(f).

## STATUTES AND REGULATIONS

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. Section 8(a)(1) of the Act makes it an "unfair labor practice" for any employer "to interfere with, restrain, or

coerce employees in the exercise of the rights guaranteed in [Section 7]." *Id.* § 158(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether petitioners violated section 8(a)(1) of the NLRA by prohibiting employees at their nursing care centers from wearing stickers in immediate resident-care areas that had the word "BUSTED" stamped in bright red ink over the image of a judge's gavel and block and incorrectly implied that the Board had found that petitioners violated federal labor law.

2.     Whether petitioners violated section 8(a)(1) of the NLRA by removing from bulletin boards that they had provided for "proper Union notices" a flyer that, among other things, accused petitioners of "exploiting the elderly" in their "ruthless pursuit of more profit."

## STATEMENT OF THE CASE

### A.     Factual Background

1. The petitioners in this case are six long-term nursing care facilities (the "Centers") in Connecticut and the company that manages them, HealthBridge Management, LLC ("HealthBridge").  The Centers provide convalescent and skilled nursing care to their residents, many of whom are elderly and cognitively impaired. Among other things, the Centers provide their residents with physical therapy, occupational therapy, speech therapy, and assistance with day-to-day living.

For several years, some of the Centers' employees have been represented by New England Health Care Employees Union, District 1199 (the "Union").   In recognition of their employees' rights under the National Labor Relations Act ("NLRA" or "Act"), petitioners have agreed to adopt a number of policies that permit employees to engage in union-related speech or activities in the workplace, so long as they do not interfere with or compromise the Centers' primary mission of caring for their residents.

For instance, although both the National Labor Relations Board ("NLRB" or "Board") and the courts have held for decades that healthcare facilities are presumptively permitted to prohibit employees from wearing insignia in immediate patient-care areas, *see St. John's Hosp.*, 222 N.L.R.B. 1150 (1976), *enforcement granted in part and denied in part* 557 F.2d 1368 (10th Cir. 1977), the Centers have agreed to permit employees to wear insignia—including union-related insignia—in all areas of their facilities, so long as that insignia is not reasonably likely to disturb residents or disrupt their care.  Thus, in addition to wearing pins bearing messages such as "make a difference," "certified nursing assistants make every day brighter," and "nursing assistants caring hands loving hearts," employees have been permitted to wear pins bearing messages such as "1199 New England Health Care Employees Union SEIU," "one vision one fight one union 1199," "we are stronger together 1199

delegate," and "SEIU for Obama." JA1068, JA1045, JA1046, JA1048, JA1049; *see* JA1032.

Likewise, although employers are not required to allow employees to use company bulletin boards to display union-related notices, *see Eaton Techs., Inc., A Fasco Co.*, 322 N.L.R.B. 848, 853 (1997) ("there is no statutory right of employees or a union to use an employer's bulletin board"), the Centers have agreed through their collective bargaining agreements ("CBAs") to supply bulletin boards on which "Union notices" can be displayed, subject to the caveat that all such notices must be "proper." JA1117, JA1165, JA1215, JA1263, JA1311, JA1357; *see* JA1028. Consistent with that caveat, the Centers repeatedly have removed flyers that contained inflammatory, derogatory, or false information, such as a flyer stating that petitioners "reward dedicated staff" "[b]y kicking them out the door," and accusing petitioners of having "robbed employees of hundreds of hours of vacation time," and a flyer stating "HealthBridge has no respect for us or our residents—all they want is to strip us of our rights, destroy our standards, cripple our ability to give quality care and turn our nursing home into a sweatshop." JA1053, JA1055-60; *see* JA1029. Although the Union could have challenged any of these removals through a grievance procedure had it believed that they violated the CBAs, it did not do so.

2. The events at issue in this case followed on the heels of the March 21, 2011, filing of a complaint by the Board against petitioners relating to certain of their

housekeeping employees.[1]  On March 25, just a few days after that complaint was filed—and long before any hearing had been held or decision issued—the Union distributed stickers and flyers at each Center stating that HealthBridge and the respective Center had been "BUSTED" by the Board for violating federal labor law. The stickers, which were approximately two and a half inches in diameter, had the word "BUSTED" stamped in bright red ink over the image of a judge's gavel and block, and then continued, "March 21, 2011 By National Labor Relations Board For Violating Federal Labor Law."  JA1050, *see* JA1029.  At the top, each sticker stated "HealthBridge," as well as the name of the Center at which it was distributed. JA1049; *see* JA1029.  These stickers were distributed to employees first thing in the morning.



The "BUSTED" sticker, JA1050 (actual size)

---

[1] An ALJ issued a decision on that complaint on August 1, 2012, and the case remains pending before the Board.  *See HealthBridge Management, Care Realty (a/k/a CareOne), et al.*, Case 34-CA-012715.

When HealthBridge's senior vice president of labor relations, Lisa Crutchfield, learned that employees were wearing these stickers in resident-care areas, she immediately became concerned. Crutchfield, who had a decade of experience advising healthcare centers on such matters, feared the stickers "might be confusing to [residents] or lead them to believe that [the Centers] had committed some kind of crime due to the image of a judge's gavel and the word 'busted.'" JA1029; *see* JA799-800. Accordingly, consistent with the Board's guidance in this area and the distinction it consistently has drawn between patient-care and non-patient care areas, *see St. John's Hosp.*, 222 N.L.R.B. 1150, she concluded that employees could wear the stickers in non-resident care areas but must remove them when providing residents with care or when working in resident-care areas, such as resident rooms, resident dining rooms, resident activity lounges, and resident treatment rooms. JA1029. Crutchfield promptly convened a conference call with managers at the Centers to inform them of this policy, and instructed that any employee that refused to abide by the policy should be asked to punch out and leave but should not be disciplined. JA1029.

In addition to distributing the stickers, the Union also posted on bulletin boards at each of the Centers a flyer that contained the same "BUSTED" logo as well an array of derogatory accusations against petitioners. The flyer began by claiming that petitioners will do "ANYTHING—even violate labor law—in their

ruthless pursuit of more profit." JA1062-67; *see* JA1028. It went on to accuse them of, among other things, "resorting to scare tactics, fear-mongering and illegal behavior to get their way," "trying to frighten residents and their families," and aiming "to destroy our jobs, our families and our neighborhoods." JA1062-67; *see* JA1028. After stating that the Board had issued an 18-page complaint against petitioners for "massive violations of federal law," the flyer closed by characterizing HealthBridge as "another … greedy, national corporation[] exploiting the elderly and their caregivers by lying, cheating and even law-breaking." JA1062-67; *see* JA1028. Upon reading this flyer, Crutchfield informed managers at the Centers that it was not a "proper" means of notifying employees of the filing of the underlying complaint and therefore could and should be removed from their bulletin boards. JA1029.

### B.    The Complaint and the Administrative Hearing

The Union responded to these events by filing a variety of unfair labor practice charges against petitioners, and the Board subsequently filed a complaint asserting much the same charges. In its complaint, the Board alleged that petitioners violated section 8(a)(1) by restricting the areas in which employees could wear the stickers and by removing the flyers from the Centers' bulletin boards. In effect, the Board alleged that, although the Centers were not legally required to allow their employees to wear *any* stickers in resident-care areas, or to post *any* union notices on the

Centers' bulletin boards, once the Centers decided to permit *some* stickers and notices, they could not prohibit any others—regardless of how disruptive, defamatory, or disparaging they might be.[2]

The ALJ held a hearing at which Crutchfield testified as to the reasoning behind the instructions she gave. As to the stickers, Crutchfield explained how the specific characteristics of the stickers led her to conclude that they were particularly likely to confuse and upset the Centers' residents if worn in resident-care areas:

> [T]he sticker itself says busted with a judge's gavel. And it's saying that the center was busted. It suggests some kind of crime. I was concerned that residents would think—would not understand this was related to a labor matter and might be concerned for a larger issue. What is happening here at this center? Has this center been convicted of a crime? Is that impacting the care that I'm receiving? So my concern was that residents may be upset by this, may not understand it and it may create confusion and disruption for them.

---

[2] The complaint later was amended to include an allegation that, contrary to Crutchfield's instructions, employees at a few of the Centers were not specifically informed that they could wear the "BUSTED" sticker in non-resident-care areas. JA1044. The Board ultimately sustained that charge as to two Centers based on testimony that one administrator at each mistakenly gave one or more employees insufficiently clear instructions. JA1021, JA1034-35. While petitioners do not believe that these isolated and *de minimis* deviations from their official policy are sufficient to give rise to a violation of the Act, *see infra* p. 26 n.3, they do not dispute that employees should have been permitted to wear the sticker when they were not in resident-care areas or caring for residents.

8

JA799-800. Crutchfield explained that she arrived at that conclusion based on, among other things, her ten years of experience advising healthcare facilities in these types of matters. JA764-65; JA796-800.

To substantiate Crutchfield's concerns, petitioners also presented the expert testimony of Dr. Ilene Warner-Maron, a gerontological nurse who holds master's degrees in social gerontology, health administration, and law and social policy and a doctorate in health policy, and has worked since 1991 as a director of nursing and as an administrator in nursing facilities. *See* JA1029-30; JA710-13. "Based on her expertise, knowledge, education, training, and experience, and her knowledge of working with older adults in nursing home settings," JA1030, Dr. Warner-Maron testified that the "BUSTED" sticker, "when worn at chest level by a caregiver," was reasonably like to disturb residents or disrupt their care. JA1030.

As she explained, petitioners' residents are "vulnerable adult[s] having physical and/or cognitive impairments, and who [are] dependent on the caregiver for [their] care." JA1030; *see* JA720. Upon seeing the sticker, such a "resident could easily become agitated, upset, worried, and concerned that the facility had violated some law which might cause the facility to close, resulting in the patient being moved from the facility, [thus] constituting a threat to the safety and security of the resident." JA1030; *see* JA722, JA729. Dr. Warner-Maron also explained that exposing residents to the sticker would put petitioners at risk of violating federal and

state regulations that require skilled nursing facilities to "provide a safe, secure, nonthreatening atmosphere to their patients," as "the sticker increases the risk that patients would feel threatened and emotionally abused." JA1030; *see* JA722, JA729.

As to the flyer, Crutchfield testified that petitioners repeatedly have interpreted the CBAs' requirement that the bulletin boards be used only for "proper Union notices" as prohibiting the Union from posting flyers that are "derogatory or disparaging towards HealthBridge Management, towards the center, towards personnel at the center," and/or contain "untruthful statements." *See* JA774, JA817; JA1028-29. Consistent with that understanding, she testified that she had ordered removal of, among things, flyers stating that petitioners "reward dedicated staff" by "kicking them out the door," have "no respect for ... residents," and want to "destroy ... standards" and "cripple ... quality care." JA1053, JA1055-60; JA1029. Crutchfield explained that the she concluded that the "BUSTED" flyer could and should be removed from the Centers' bulletin boards because it, too, was "derogatory and disparaging" and contained "statements which are not accurate or truthful." JA1028.

### C.     The Decision of the Administrative Law Judge

Although the Board's general counsel presented no evidence contradicting the testimony of either Crutchfield or Dr. Warner-Maron, the ALJ nonetheless sustained the Board's charges. As to the stickers, the ALJ concluded that because petitioners

did not ban *all* insignia in resident-care areas, their decision to ban the "BUSTED" sticker in resident-care areas was presumptively invalid.   The ALJ based this conclusion on the Board's decision in *Saint John's Health Center & California Nurses Association National Nurses Organizing Committee*, 357 N.L.R.B. No. 170 (Dec. 30, 2011), a case that announced this new presumption of invalidity where so-called "selective bans" are concerned several months after the events at issue here occurred.   The ALJ then concluded that petitioners had not demonstrated "special circumstances" sufficient to overcome this presumption, dismissing Crutchfield's testimony as "entirely speculative" because it was not based on "any complaint she received from residents or family members, or … from employees or supervisors that the sticker was, *in fact*, upsetting to, or a cause of concern for the residents." JA1035 (emphasis added).  The ALJ likewise dismissed Dr. Warner-Maron's expert opinion as "mere speculation, unsubstantiated surmise and subjective belief" because it "was not informed by speaking to any patients, family members or care givers" about the sticker.  JA1035.

As to the flyer, although the Board did not bring a section 8(a)(5) claim regarding compliance with the CBAs, the ALJ concluded that the contractual caveat that any union notices posted on the bulletin boards that petitioners provide must be "proper" does not give petitioners "the power to decide which notices were not proper or the right to remove flyers which [they] deemed were improper."  JA1033.

11

The ALJ also concluded that the flyer "cannot be considered inaccurate," "inflammatory or derogatory to" petitioners, and instead was "a legitimate form of communication to" employees "that the regional office of the Board had issued a complaint against their employer for violating the Act."  JA1033.

### D.   Decision of the Board

In a partially divided decision, the Board sustained the ALJ's ruling on both the sticker and the flyer.  As to the sticker, a two-member majority first reiterated the Board's new presumption of invalidity where "selective bans" are concerned, then adopted and reiterated the ALJ's characterization of the uncontroverted testimony of Crutchfield and Dr. Warner-Maron about the serious risk of confusion and disruption that the sticker posed as "only speculative" because it was not based on actual complaints from residents or their family members.  JA1022-23.  The majority also suggested that this testimony was not credible because petitioners had sent residents letters providing information about the ongoing labor dispute and assuring that the dispute would not disrupt continuity of care.  JA1023.  As to the flyer, the full Board agreed with the ALJ's conclusions and reiterated its view that the CBAs did not provide petitioners with a right "unilaterally to determine which Union notices were proper and to remove any notices or flyers [they] deemed improper."  JA1021.

Board Member Miscimarra dissented from the majority's conclusion that petitioners violated the Act by ordering the removal of the "BUSTED" sticker from

12

immediate patient-care areas.  As he explained, under long-standing law until the recent *Saint John's* decision, it was "not incumbent on [petitioners] to ban *all* insignia in immediate patient-care areas for [their] prohibition of the 'Busted' sticker in immediate patient-care areas to be presumptively valid." JA1025.  Instead, "'[i]n healthcare facilities, restrictions on the wearing of *union-related buttons* are presumptively valid in immediate patient care areas.'" JA1025.  In his view, "the notion that an insignia ban must be categorical to be presumptively valid disregards the rationale underlying the presumption:  that patients and their families— 'irrespective of whether [they] are labor or management oriented—need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed.'" JA1025 (quoting *NLRB v. Baptist Hosp.*, 442 U.S. 773, 783 n.12 (1979)).

Member Miscimarra also faulted the majority for "impos[ing] an unreasonably high and unrealistic burden … to demonstrate special circumstances." JA1025.  As he explained, contrary to the reasoning of the ALJ and the majority, "[e]vidence of actual disturbance of patients is not required to demonstrate special circumstances, and such a standard would be especially objectionable in a healthcare facility" because "an objectionable button could be prohibited only if it were first permitted (even though managers reasonably believed it would upset patients or their families)." JA1025-26.  Because the "experience, intuitive reasoning and common

sense" on which Crutchfield and Dr. Warner-Maron relied were more than sufficient to substantiate their uncontroverted views, he would have concluded that special circumstances—even though unnecessary—had been proven. JA1025-26.

## SUMMARY OF ARGUMENT

This case is a classic illustration of how the NLRB's ever-shifting legal landscape makes it nearly impossible for employers to avoid unfair labor practice charges. For decades the Board and the courts have reiterated the common sense rule that healthcare facilities presumptively are permitted to impose restrictions on wearing insignia in immediate patient-care areas. Likewise, both the Board and the courts consistently have reiterated that employers are permitted to impose neutral restrictions on the use of any bulletin boards on which they permit a union to post notices. Both rules sensibly allow employers to permit more union activity than strictly necessary while retaining the ability to limit inflammatory, harmful, or inappropriate material.

Acting in good-faith reliance on those settled rules, petitioners concluded that they could prohibit their employees from wearing a very misleading and potentially disruptive sticker in immediate resident-care areas, and could remove from their own bulletin boards a flyer that accused them of, among other things, "exploiting the elderly" in their "ruthless pursuit of more profit." The Board responded by declaring these heretofore presumptively *valid* actions now presumptively *invalid*, and then

14

making its new presumptions of invalidity both retroactive and virtually unrebuttable. The Board's actions, which ultimately will lead employers to adopt more categorical limits on union activities, find no support in law, logic, or fact.

It is both well settled and sensible that healthcare facilities presumptively are entitled to restrict the wearing of insignia in immediate patient-care areas to protect their patients from anything that might disrupt their care. There is no rational reason for reversing that presumption simply because a healthcare facility has decided to restrict only particularly disruptive insignia instead of permissibly imposing an across-the-board ban. Indeed, reversing the presumption because a healthcare facility has adopted an insignia policy that is *more* solicitous of union-related speech than the law requires is both nonsensical and counterproductive. The Board's newly minted reversible presumption cannot help but incentivize healthcare facilities to restrict far more union-related speech than they otherwise would.

Even if there were any valid basis for reversing the traditional presumption, moreover, there certainly is no valid basis for doing so retroactively, or for making that presumption so strong that it is essentially impossible to rebut. Yet that is precisely what the Board did in this case, dismissing the uncontroverted testimony of two healthcare professionals as "mere speculation" because it was based on their experience and expertise rather than actual complaints from residents or their family members. Of course, the only plausible way that petitioners could have obtained

15

actual complaints about the "BUSTED" sticker would have been by permitting employees to wear it in resident-care areas and documenting the disruption that occurred. There is no justification for forcing healthcare providers to permit and document actual patient harm before they can take reasonable actions to prevent it. As this Court already has concluded, a healthcare facility need not resort to such senseless and potentially unethical measures to avoid violating the NLRA. The Board's contrary view demonstrates a disturbing tendency to elevate its vision of labor policy over patient-care concerns and common sense.

The Board's conclusions with respect to the "BUSTED" flyer suffer from the same basic defects. It is equally well settled that employers may impose neutral restrictions on any access to employer bulletin boards that they agree to provide a union. That is what the parties here did in their CBAs, which authorize the Union to post only "*proper* Union notices" on the bulletin boards that the Centers have agreed to provide. Yet according to the Board, the term "proper" presumptively imposed no employer-enforceable restrictions at all unless petitioners could demonstrate both that they repeatedly have relied on that term to remove postings that they deemed improper *and* that the Union affirmatively acquiesced in those decisions. Thus, even though petitioners provided uncontroverted testimony that they have, in fact, relied on the "proper" provision to remove numerous flyers that contained derogatory, defamatory, or inaccurate information, the Board still

16

concluded that petitioners have no right to remove *anything* from their bulletin boards because they did not prove that the Union agreed with those decisions. In other words, the Board effectively rewrote the parties' CBAs to render the term "proper" superfluous and supply the Union with the very unfettered right of access to which the Board's own precedents insist unions are not entitled.

To add final insult to injury, the Board alternatively concluded that the "BUSTED" flyer was *not* "inaccurate," "derogatory" or even "inflammatory." That startling conclusion is indefensible. Among other things, the flyer accused petitioners of "exploiting the elderly and their caregivers by lying, cheating and even law-breaking," "resorting to scare tactics, fear-mongering and illegal behavior to get their way," "trying to frighten residents and their families," aiming "to destroy our jobs, our families and our neighborhoods," and being willing to do "ANYTHING— even violate labor law—in their ruthless pursuit of more profit." JA1028. The notion that this outrageous diatribe was a "proper" means of notifying employees that an unfair labor practices charge had been filed is just another way of reading the term "proper" right out of the CBAs—and reading common sense out of the nation's labor policy.

## STANDARD OF REVIEW

Although the Board's presumptions and findings generally are entitled to deference, judicial review is "not so deferential that the court will merely act as a

17

rubber stamp for the Board's conclusions." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445 (D.C. Cir. 2004). Accordingly, in addition to being "rational and consistent with the Act," *N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011), any "presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts." *Baptist Hospital*, 442 U.S. at 787. As for the Board's orders, an order "will not survive review when the Board's decision has no reasonable basis in law or when the Board has failed to apply the proper legal standard." *Titanium Metals Corp.*, 392 F.3d at 446. And, of course, conclusions cannot be sustained if they are arbitrary, capricious, or not supported by substantial evidence. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374-77 (1998).

## STANDING

Petitioners are "aggrieved by" the Board's Decision and Order and therefore have standing to appeal under Article III and 29 U.S.C. § 160(f). *See Liquor Salesmen's Union v. NLRB*, 664 F.2d 1200, 1206 n.8 (D.C. Cir. 1981) (standing exists where there is an "adverse effect in fact" on petitioners); *see also Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (standing exists where complainant is "an object of the action ... at issue").

## ARGUMENT

**I.    Petitioners Did Not Violate The NLRA By Prohibiting Employees From Wearing The "BUSTED" Sticker In Immediate Resident-Care Areas.**

The Board's conclusion that petitioners could not prohibit employees from wearing the "BUSTED" sticker in immediate resident-care areas is legally, factually, and logically unfounded. "In the healthcare context," it has long been settled law that "restrictions on the wearing of union insignia in 'immediate patient care' areas are presumptively valid." *Wash. State Nurses Ass'n v. NLRB*, 526 F.3d 577, 580 (9th Cir. 2008). That presumption reflects the common sense and humanitarian principle that in patient-care areas, patients come first. There is no sound reason for doing away with that presumption simply because a healthcare facility has adopted a more employee-friendly approach of prohibiting only insignia that pose particularly acute patient-care concerns. Even if there were, the uncontroverted testimony of two healthcare professionals that the "BUSTED" sticker was reasonably likely to confuse and disturb residents should have been more than sufficient to justify petitioners' decision to restrict it to non-resident-care areas. The Board's contrary conclusion not only elevates labor policy over patient-care concerns, but also has the perverse result of incentivizing healthcare facilities to eliminate policies designed to facilitate union-related speech.

19

**A.     Under Long-Settled Law, Restrictions on Insignia in Patient-Care Areas of Healthcare Facilities Are Presumptively Valid.**

While the NLRA generally protects the rights of employees to wear union-related insignia in the workplace, both the Board and the courts have recognized for decades that healthcare facilities demand a different approach. "Hospitals, after all, are not factories or mines or assembly plants." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 509 (1978) (Blackmun, J., concurring). They "are facilities 'where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family … need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one reminiscent of the tensions of the marketplace in addition to the tensions of the sick bed.'" *USC Univ. Hosp. & Nat'l Union of Healthcare Workers*, 358 N.L.R.B. No. 132 at *35 (Sept. 17, 2012) (quoting *Baptist Hosp.*, 442 U.S. at 783 n.12). Healthcare facilities thus have not only a right, but an obligation, "to protect the patients and their families from the disquiet that might result if they perceived that [their] staff had concerns other than the care of patients." *Baptist Hosp.*, 442 U.S. at 783.

In keeping with that understanding, the Board long ago concluded that its "usual presumption that rules against solicitation on nonwork time are invalid gives too little weight to the need to avoid disruption of patient care and disturbance of patients in the hospital setting." *Id.* at 778. That is particularly so "in areas such as

operating rooms, patients' rooms, and patients' lounges," where a healthcare facility's "main function" of "patient care" is "largely performed." *Beth Israel*, 437 U.S. at 506. Because "'a tranquil atmosphere is essential to the carrying out of that function,'" *id.* at 495, the Board consistently has deemed it "appropriate to permit hospitals special latitude to restrict union activity in patient-care areas." *USC Univ. Hosp.*, 358 N.L.R.B. No. 132 at *35; *see also, e.g.*, *Sutter E. Bay Hosps. v. NLRB*, 687 F.3d 424, 433 (D.C. Cir. 2012) ("hospitals have the leeway to enact more stringent prohibitions in patient-care areas"). It is therefore settled law that "restrictions on the wearing of union insignia in 'immediate patient care' areas are presumptively valid." *Wash. State Nurses*, 526 F.3d at 580; *see also, e.g.*, *Casa San Miguel, Inc.*, 320 N.L.R.B. 534 (1995).

Indeed, as both the Supreme Court and this Court have made clear, healthcare facilities retain "special latitude" to impose such restrictions even outside immediate patient-care areas when necessary to guard against disruptions in patient care. Although restrictions outside immediate patient-care areas are presumptively invalid, that presumption may be overcome by a showing of "special circumstances," which typically is satisfied when a facility demonstrates that the area in question is frequented by patients. For instance, in *Baptist Hospital*, the Supreme Court rejected the Board's attempt to require "sweeping protection of solicitation in all but 'immediate patient-care areas'" when uncontroverted evidence

21

demonstrated that patients routinely frequented other areas as well. *Baptist Hosp.*, 442 U.S. at 782-84. Likewise, in *Baylor University Medical Center v. NLRB*, 662 F.2d 56 (D.C. Cir. 1981), this Court rejected the Board's attempt to invalidate a solicitation ban in a cafeteria that was "regularly used by patients and their visitors." *Id.* at 65. And in *Beth Israel*, although the Supreme Court approved a restriction on solicitation in areas not frequented by patients, it cautioned that "'[t]he Board [bears] a heavy continuing responsibility to review its policies concerning organizational activities in various parts of hospitals'" and "'should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized.'" *Beth Israel*, 437 U.S. at 508.

As these decisions reflect, "in the context of health-care facilities, the importance of the employer's interest in protecting patients from disturbance cannot be gainsaid." *Id.* at 505. Accordingly, when it comes to patient-care areas—whether "immediate" or otherwise—courts repeatedly have made clear that the Board has no business interfering with a healthcare facility's judgment that solicitation or insignia restrictions are "'necessary to avoid disruption of health care operations or disturbance of patients.'" *Baptist Hosp.*, 442 U.S. at 781. Only when healthcare facilities attempt to extend those restrictions to areas that patients do *not* frequent is a different approach appropriate.

22

**B.    Petitioners' Policy Toward the "BUSTED" Sticker Was Entirely Consistent With the Law That Governed at the Time.**

Under those long-settled principles, this is an easy case. Mindful of their employees' interest in union-related activities, petitioners have adopted a policy more favorable toward those activities than the law demands: They typically allow employees to wear insignia—including union-related insignia—in the workplace, even in immediate resident-care areas. But they balance that more speech-permissive approach with a continuing ability to ensure that insignia do not interfere with their primary mission of patient care. Here, petitioners understandably became concerned for the well-being of their residents, many of whom are elderly and cognitively impaired, when employees began wearing a sticker that stamped "BUSTED" in bright red ink over the image of judge's gavel and block and incorrectly implied that the Board had concluded that petitioners violated federal labor law. Accordingly, following the guidance that both the Board and the courts have provided, petitioners concluded that employees could wear the stickers in non-resident care areas but could not wear them when caring for residents or working in resident-care areas.

Although petitioners were under no obligation to justify this presumptively lawful decision, they provided uncontroverted evidence that their actions were, in fact, motivated by patient-care concerns. Crutchfield, who made the decision to confine the stickers to non-resident-care areas, testified that she did so "out of

23

concern for the residents, in order to ensure that their care was not interrupted, and that they did not have unnecessary concern regarding an issue that might be confusing to them or lead them to believe that [petitioners] had committed some kind of crime due to the image of a judge's gavel and the word 'busted.'"  JA1029; *see* JA799-800.  As she explained, based on her considerable experience with healthcare facilities, she "was concerned that the residents may believe that something [petitioners] had done may impact the care they received, thereby upsetting them." JA1025, JA1029.

Dr. Warner-Maron's expert testimony readily substantiated Crutchfield's common sense concerns.  "[B]ased on her expertise, knowledge, education, training, and experience, and her knowledge of working with older adults in nursing home settings," she testified that the sticker posed a serious risk of disturbing petitioners' residents, many of whom are "vulnerable adult[s] having physical and/or cognitive impairments and who [are] dependent on the caregiver for [their] care."  JA1030; *see* JA720.  As she explained, upon seeing the sticker, a "resident could easily become agitated, upset, worried, and concerned that the facility had violated some law which might cause the facility to close, resulting in the patient being moved from the facility, [thus] constituting a threat to the safety and security of the resident." JA1030; *see* JA722, JA729.  Dr. Warner-Maron also testified that permitting employees to wear the sticker in resident-care areas would have conflicted with

"federal and state regulations [that] require … skilled nursing facilities [to] provide a safe, secure, nonthreatening atmosphere to their patients," as "the 'busted' sticker would cause the resident to become fearful that the facility is in legal trouble, thereby causing the patient to become emotionally stressed and feel threatened." JA1030; *see* JA722, JA729.

The Board's general counsel did not present any evidence contradicting this testimony. Nor did the general counsel allege or attempt to demonstrate that petitioners' actions toward the sticker were motivated by anything other than a desire "'to avoid disruption of health care operations or disturbance of patients.'" *Baptist Hosp.*, 442 U.S. at 781. To the contrary, the general counsel stipulated that petitioners routinely allowed employees to wear innocuous union-related insignia in resident-care areas, thus eliminating any possible suggestion that their actions reflected a discriminatory, all-but-union-insignia approach. There is thus no basis whatsoever from which the Board could have concluded that the strong presumption of validity that attaches to restrictions in immediate patient-care areas was overcome.

### C.     The Board's New "All or Nothing" Approach Toward Insignia Restrictions Is Neither Legally Nor Factually Sustainable.

Unable to overcome the traditional presumption that respected the decision-making of healthcare facilities in immediate patient-care areas, the Board decided to change its rules mid-stride. Notwithstanding decades of settled law to the contrary, nine months *after* the incident with the sticker occurred, the Board announced that

25

restrictions on insignia in immediate patient-care areas would no longer be entitled to a presumption of validity unless a healthcare facility maintains a ban on *all* insignia in such areas, not just insignia that is particularly likely to disturb patients or disrupt their care. *See Saint John's*, 357 NLRB No. 170. The Board declared that so-called "selective bans" henceforth would be considered presumptively *invalid*, even when applied only in immediate patient-care areas, and applied only to a single item of union-related insignia. The Board then invoked that new rule in this case to conclude that petitioners' policy toward the "BUSTED" sticker was unlawful.[3]

As the dissenting member in *Saint John's* explained (and a different dissenting member reiterated in this case), the Board's about-face is not grounded in law, logic, or fact, and cannot be reconciled with the unique considerations that healthcare facilities demand. To be sure, the Board generally is entitled to deference in adopting presumptions to govern the adjudication of labor law disputes. But its presumptions

---

[3] The Board also found that Newington Health Care Center and Westport Health Care Center violated the Act because one employee from each testified that she was not specifically told that she could wear the sticker outside of resident-care areas when she was asked to remove it. JA1034-35. While petitioners do not dispute that employees should have been permitted to wear the sticker in non-resident-care areas, this testimony is manifestly insufficient to establish that employees were prohibited from doing so. Even if were sufficient, moreover, the testimony establishes "at most a minimal intrusion upon employees['] § 7 rights," *S. Md. Hosp. Ctr. v. NLRB*, 801 F.2d 666, 672 (4th Cir. 1986), and "federal courts have consistently held that marginal infringements do not violate the Act." *NLRB v. Motorola, Inc.*, 991 F.2d 278, 283 (5th Cir. 1993). After all, "[n]ot every interference with employee rights rises to the level of an unfair labor practice." *Id.*

must be consistent with the reality that healthcare facilities "are not factories or mines or assembly plants." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 509 (1978) (Blackmun, J., concurring). They must be consistent, moreover, with the Act itself and the policies it embodies, and "must rest on a sound factual connection between the proved and inferred facts." *Baptist Hosp.*, 442 U.S. at 787. The Board's new reversible presumption satisfies none of these standards.

At the outset, the Board's approach to "selective" restrictions "unnecessarily upset[s] the careful balance struck by the Supreme Court between employee organizing rights and a health care employer's legitimate patient care concerns." *Saint John's*, 357 NLRB No. 170 (Hays, Member, dissenting). As the Court's cases make clear, in healthcare facilities, patient-care concerns must come first. Whatever the Board's expertise in labor policy, it is poorly positioned to second-guess the decisions of healthcare facilities as to whether or which insignia will interfere with patient care. The traditional presumption reflects the relative expertise of the Board and healthcare providers and properly prioritizes patient care over the labor policy of the day. Of course, the presumption is only that, and a healthcare facility that allowed all insignia except union-related insignia could not hide behind it. But as a general matter, the presumption properly accounts for relative expertise and the fact that "the importance of [a healthcare facility's] interest in protecting patients from disturbance cannot be gainsaid." *Beth Israel*, 437 U.S. at 505.

The Board's decision to reverse the presumption simply because an employer does not ban all insignia runs headlong into those sensible Supreme Court precedents. It is one thing to apply a presumption of invalidity when a healthcare facility attempts to restrict union-related insignia in *non*-patient-care areas, where the "possibility of disruption to patient care … must be deemed remote." *Beth Israel*, 437 U.S. at 495. But a healthcare facility that allows all insignia—including union insignia—in patient-care areas except those it believes pose a threat to patient care does not evince hostility to union activity or otherwise abandon its claim to deference. Flipping the presumption in those circumstances thus abandons sound policy, threatens unfounded interference in patient care, and exhibits a disturbing tendency to elevate labor policy over patient care.

Indeed, the only two cases in which the Board has applied its new presumption confirm that there is no rational basis for assuming that every limited restriction is the product of anti-union discrimination, rather than genuine patient-care concerns. Both here and in *Saint John's*, it was undisputed that the healthcare facility routinely permitted pro-union insignia and sought to restrict only a single item that it deemed particularly disruptive. *See supra* pp. 3-4; *Saint John's*, 357 N.L.R.B. No. 170, at *1 ("[b]efore and after the [challenged] ban," hospital "allowed RNs to wear … union buttons"). Moreover, in each case, the facility restricted that item *only* in immediate patient-care areas, once again displaying a concerted effort to protect, not suppress,

28

union-related speech. *Id.* A healthcare facility that has adopted a policy *more* favorable toward union-related speech than the law requires can hardly be presumed to have been motivated by anti-union bias in the rare instance when it concludes that patient-care concerns demand a more restrictive approach.[4]

"[T]he notion that an insignia ban must be categorical to be presumptively valid [also] disregards the rationale underlying the presumption" of validity in immediate patient-care areas. JA1025 (Miscimarra, concurring in part and dissenting in part). The traditional presumption of validity "rests on the Board's determination that union insignia in immediate patient care areas 'at any time' might be unsettling to patients." *Saint John's*, 357 NLRB No. 170 at *12 (Hays, Member, dissenting). That determination does not cease to hold true with respect to *all* insignia in *all* places just because a healthcare facility has determined that certain forms of insignia are sufficiently innocuous to create no serious patient-care concerns. To the contrary, a "particularly disruptive" piece of insignia is "just as

---

[4] It might be a different case if the Board limited its presumption to instances in which a healthcare facility has selectively prohibited *all* union-related insignia. But as both this case and *Saint John's* make clear, the Board is applying the presumption without regard to whether all or only a single piece of union-related insignia has been prohibited. Indeed, quite counterintuitively, the Board is applying its presumption *precisely because* a healthcare facility has *not* prohibited other forms of union insignia.

intrusive to patients as it would have been if other insignia had not been allowed in the past." *Id.* at *11-12.

To make matters worse, the Board's reversible presumption makes little sense as a matter of sound labor policy, as it perversely incentivizes healthcare facilities to be *less* solicitous of the very statutory rights that the Board purports to be protecting. Section 8(a)(1) makes it "an unfair labor practice for an employer … to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by section 7 of the NLRA.  29 U.S.C. § 158 (a)(1).  Of course, "these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee," *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945), such as the duties healthcare facilities have toward their patients.  But section 8(a)(1) certainly contemplates presumptions and rules that will encourage employers to be as respectful of these rights as they can within the confines of their other obligations.

The Board's "all or nothing approach" to insignia does precisely the opposite, as it protects healthcare facilities only if they adopt the most draconian approach possible toward insignia in patient-care areas.  By the Board's logic, a facility "must indiscriminately prohibit all unofficial buttons, including those bearing innocuous messages that promote a 'relaxing and helpful atmosphere,'" JA1025, or risk a labor law violation every time it concludes that a particularly disruptive item warrants a

more restrictive approach.  This is a case in point.  There is no dispute that petitioners have allowed employees to wear all sorts of insignia—including pro-union insignia—even though they clearly could have imposed a blanket ban.  JA1032.  Yet rather than laud petitioners for their efforts to facilitate union-related speech, the Board responded by invoking these past actions to strip them of any presumption of validity when petitioners drew the line at the confusing and potentially disruptive "BUSTED" sticker.  In other words, the Board punished petitioners for doing what section 8(a)(1) encourages employers to do—namely, attempt to refrain from interfering with the exercise of their section 7 rights whenever possible.

The Board's new approach to limited restrictions is all the more troubling because it is wholly unnecessary to address whatever concerns might be animating its adoption.  The typical presumption of validity in immediate patient-care areas is just a presumption; it always can be overcome by a showing that the facility's actions were the product of discriminatory enforcement rather than patient-care concerns.  Indeed, in *Saint John's*, the ALJ concluded that the presumption of validity was overcome by evidence that the hospital had permitted employees to wear a ribbon bearing a nearly identical message in patient-care areas when it was distributed by the hospital rather than the union.  *See* 357 N.L.R.B. No. 170, at *27.  Yet rather than simply affirm that application of settled legal principles to the unusual facts at hand, the Board insisted on adopting its general counsel's request to dispense with the

31

presumption of validity altogether whenever a facility has not flatly prohibited all insignia.

The ultimate result is not only to force healthcare facilities to restrict employee speech that they otherwise would permit, but to create labor law violations where they do not exist. "A finding that [a] rule was merely 'selective' is no substitute for a finding of disparate enforcement." *Id.* at *9. The Board should not be able to relieve its general counsel of the burden of proving the latter by adopting a presumption that just assumes the conclusion necessary to sustain an unfair labor practices charge in the unique context of restrictions in immediate patient-care areas of healthcare facilities.

In all events, the Board certainly should not able to spring its new reversed presumption on petitioners only after they took the actions they did in good-faith reliance on the Board's past precedents that permitted them to do so. It is well settled that an agency may not replace old law with new law and then apply the new rule, as here, to upset reasonable reliance interests. *See, e.g.*, *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (when "there is a substitution of new law for old law that was reasonably clear, a decision to deny retroactive effect is uncontroversial"); *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993) (when applying new rule would "give rise to questions of fairness, it may be necessary to deny retroactive effect to a rule announced in an agency adjudication in

32

order to protect the settled expectations of those who had relied on the preexisting rule"). Indeed, to invoke a new rule to retroactively render unlawful conduct that was lawful when undertaken is the very definition of arbitrary and capricious agency action. *See FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

### D. The Board's "Special Circumstances" Analysis Cannot Be Reconciled With This Court's Cases or the Uncontroverted Facts.

Not only did the Board retroactively apply a presumption that is legally and factually unsound; it then compounded the problem by imposing an "unreasonably high and unrealistic burden" for overcoming that presumption. JA1025. Although they should have been under no obligation to do so, petitioners provided uncontroverted testimony from two healthcare professionals explaining precisely why the specific features of the "BUSTED" sticker posed a particular risk of disturbing or confusing the Centers' residents. Yet, without identifying a single reason to question the credibility or professional judgment of either of those witnesses, the Board dismissed their testimony as "speculative" because it was not substantiated by actual complaints from residents or their family members. JA1035.

That reasoning is flatly inconsistent with this Court's precedents. It is well-settled that a healthcare facility must "show only a *likelihood* of, not *actual*, disruption or disturbance" to overcome the presumption of invalidity that applies

33

outside of immediate patient-care areas. *Brockton Hosp. v. NLRB*, 294 F.3d 100, 104 (D.C. Cir. 2002) (emphasis added); *see also Baptist Hosp.*, 442 U.S. at 781 n.11 ("a hospital may overcome the presumption by showing that solicitation is *likely* either to disrupt patient care or disturb patients" (emphasis added)). After all, a facility "need not wait for the awful moment when patients or family are disturbed by a button before it may lawfully be restricted." *Sacred Heart Med. Ctr.*, 347 N.L.R.B. 531, 533 (2006), *vacated on other grounds by Wash. State Nurses*, 526 F.3d 577. And "it would be unreasonable"—indeed, nonsensical—"to expect [a facility] to produce evidence of disruption" that was prevented by the very restriction being challenged. *Baylor Univ.*, 662 F.2d at 62.

Yet that is precisely what the Board's decision here would seem to require. According to the Board, the ALJ appropriately dismissed Crutchfield's testimony as "entirely speculative" because it was not "based on any complaint she received from residents or family members, or any complaint she received from employees or supervisors that the sticker was, in fact, upsetting to, or a cause of concern for the residents." JA1035; *see also* JA1022. Likewise, Dr. Warner-Maron's expert testimony was dismissed as "mere speculation, unsubstantiated surmise and subjective belief" because her "opinion was not informed by speaking to any patients, family members or care givers" about the sticker. JA1035; *see also* JA1022. It is not at all clear what petitioners could have done to remedy these

purported deficiencies (particularly since they did not even know about the Board's new presumption or heightened evidentiary standard when the incident occurred) short of allowing employees to wear the "BUSTED" sticker in resident-care areas and then documenting the resulting patient harm.  *See* JA1025-26 (Miscimarra, concurring in part and dissenting in part).  A requirement to allow at least one livestock to escape before the barn door may be closed makes no sense in any context.  In the context of healthcare facilities, such a rule is not only illogical, but cold-hearted.

More fundamentally, the Board's dismissive treatment of the uncontroverted testimony petitioners presented impermissibly arrogates to itself the power to decide what will or will not disrupt patient care.  "Hospitals carry on a public function of the utmost seriousness and importance." *Beth Israel*, 437 U.S. at 508.  To be sure, the Board has an important role to play in "strik[ing] the appropriate balance between the interests of hospital employees, patients, and employers." *Id.* at 497.  But that does not mean that the Board may dismiss as "mere speculation, unsubstantiated surmise and subjective belief," JA1035, the expert opinions of healthcare professionals as to what is likely to interfere with their patient-care mission when "[n]othing in the evidence before the Board provide[s] any basis … for doubting [their] accuracy." *Baptist Hosp.*, 442 U.S. at 784; *see also, e.g.*, *Baylor Univ.*, 662 F.2d at 62-63.  And to dismiss those views simply because they are not substantiated

35

by actual patient complaints is to deny altogether the ability of healthcare facilities to make the kind of predictive judgments they make every day.

The Board alternatively suggested that the uncontroverted testimony was not credible because petitioners distributed to residents and their family members letters discussing the ongoing labor dispute. JA1022. In the Board's view, if patients were not disturbed by the letter, then they would not have been disturbed by the "BUSTED" sticker either. JA1022. That just underscores the basic disconnect between the Board's reasoning and the resident-care concerns that actually animated petitioners' actions. As Crutchfield explained, petitioners did not restrict the sticker because they did not want residents or their family members to learn of the underlying labor dispute. They did so because they were concerned that residents might become confused and agitated if they were exposed to a sticker that, with absolutely no context, misleadingly told them that their healthcare facility on which they rely for their day-to-day care had been "BUSTED" for violating federal law.

Moreover, "[u]nlike the stickers, [petitioners] communications served to provide assurances that normal operations and care would remain unaffected by the dispute, underscoring [their] commitment to taking actions necessary to maintain an atmosphere of care." JA1025. As a matter of common sense, a letter designed to reassure residents and their family members that care will continue no matter what happens is fundamentally different from a sticker designed to do nothing more than

36

convey that their healthcare facility has committed some unidentified unlawful act. The former is designed to reassure; the latter poses real risks of agitation and confusion. That the Board could not recognize the obvious difference between the two is all the more evidence of its failure to grasp the "unique considerations" that differentiate immediate patient-care settings from other contexts. *Beth Israel*, 437 U.S. at 508.

\*     \*     \*

At bottom, the Board's decision that petitioners could not restrict the "BUSTED" sticker to non-resident-care areas cannot be sustained for the simple reason that it is not supported by substantial—indeed, any—evidence. There is no evidence to support the Board's decision to deem that restriction presumptively invalid simply because petitioners decided to restrict only a single, particularly disruptive sticker rather than imposing an across-the-board ban on all insignia. Even if there were, there is certainly no evidence to support the Board's decision to disregard the uncontroverted testimony that the "BUSTED" sticker was, in fact, likely to disturb patients or disrupt their care. The Board's contrary conclusions are the product of a disturbing tendency to elevate concerns of labor policy over the imperatives of patient care. And even as a matter of labor policy, the Board's newly minted reversible presumption makes no sense, as it leaves healthcare facilities with

no choice but to impose blanket bans on all insignia, including innocuous insignia that may be compatible with patient-care priorities.

## II.   Petitioners Did Not Violate The NLRA By Removing A Derogatory And Disparaging Flyer From Bulletin Boards On Which The Union Was Permitted To Post Only "Proper Union Notices."

The Board fared no better with its conclusion that petitioners' removal of the "BUSTED" flyer from their bulletin boards violated section 8(a)(1) of the Act. Consistent with settled law permitting an employer to impose neutral restrictions on a union's use of a bulletin board furnished by the employer, petitioners provided the Union with bulletin boards that it could use to post only "*proper* Union notices." Petitioners did not violate the NLRA (or the CBAs) by removing from those bulletin boards a flyer that, among other things, accused them of "lying, cheating" and "exploiting the elderly" in their "ruthless pursuit of more profit."   The Board's contrary conclusion once again has the aberrant result of punishing employers for their efforts to be more accommodating to union-related speech than the law actually requires.

### A.   An Employer Has a Right To Ban or Limit Access to Its Own Bulletin Boards.

"[T]he right of labor organization does not imply that the employer must promote unions by giving them special access to bulletin boards." *Guardian Indus. Corp. v. NLRB*, 49 F.3d 317, 318 (7th Cir. 1995).   To the contrary, "[i]t is well established that there is no statutory right of employees or a union to use an

38

employer's bulletin board." *Eaton Techs.,* 322 N.L.R.B. at 853. Accordingly, "an employer may 'uniformly enforce a rule prohibiting the use of its bulletin boards by employees for all purposes,'" including for union-related messages. *Id.*

Once an employer decides to permit use of its bulletin boards for employee messages, "the union's right to use of the board takes on the protection of the Act." *Container Corp. of Am.*, 244 N.L.R.B. 318, 321 (1979); *see also Mid-Mountain Foods, Inc. v. NLRB*, 269 F.3d 1075 (D.C. Cir. 2001) ("Once an employer allows employee speech in a specific area of company property, the employer may not selectively censor the employees' union-related speech."). That does not mean, however, that an employer may not "insist upon the imposition of limitations, restrictions, and regulations on" bulletin board access, *In re Stevens Graphics, Inc.*, 339 N.L.R.B. 457, 461 (2003), or ban postings that do not "meet [its] rule or standard," *Penn. Am. Water Co. & Util. Workers Union of Am., Sys. Local No. 537, AFL-CIO*, 359 N.L.R.B. No. 142 (June 28, 2013), *set aside on other grounds by Penn. Am. Water Co.,* N.L.R.B. (July 2, 2014). It just means that "the employer may not … bar the union from posting notices where it allows indiscriminate employee use of its bulletin boards for posting matters of general concern unrelated to union activity." *Container Corp.*, 244 N.L.R.B. at 321.

In other words, "[t]he critical question is whether the employer is discriminating against union messages, or if it has a neutral policy of permitting only

39

certain kinds of postings." *Loparex LLC v. NLRB*, 591 F.3d 540, 545 (7th Cir. 2009).

Only when it is doing the former will it violate the law. *Cf. Helton v. NLRB*, 656

F.2d 883 (D.C. Cir. 1981) (holding that incumbent union committed unfair labor

practice by removing employee speech critical of union from bulletin boards where

other employee speech was permitted).

### B.     Petitioners Were Enforcing a Neutral Policy, Not Discriminating Against the Union, When They Removed the "BUSTED" Flyers.

Here, the answer to that critical question is crystal clear:  Petitioners removed

the "BUSTED" flyer pursuant to a neutral policy prohibiting derogatory,

disparaging, or inaccurate postings, not in an attempt to discriminate against union

messages.  Indeed, the very notion that petitioners were discriminating against union

messages is nonsensical, as the bulletin boards at issue were provided by petitioners

for the express purpose of supplying the Union with a place to post notices—a

purpose for which the boards routinely were used without controversy.  The Union's

right to use the boards was subject, however, to the contractual caveat that they were

furnished "'for posting of *proper* Union notices.'"  *See* JA1117, JA1165, JA1215,

JA1263, JA1311, JA1357; JA1028 (emphasis added).  Petitioners did not violate

section 8(a)(1) of the NLRA by concluding that the outrageous and offensive

message in the "BUSTED" flyer did not satisfy that neutral principle.

Indeed, if that flyer were a "proper" means of notifying employees that an

unfair labor practices complaint had been filed, then it is difficult to imagine what

40

kind of notice would *not* be proper. The flyer not only falsely implied that the Board already had adjudicated a complaint that in fact had only been filed a mere four days earlier, but accused petitioners of, among other things, being willing to do "ANYTHING—even violate labor law—in their ruthless pursuit of more profit," "resorting to scare tactics, fear-mongering and illegal behavior to get their way," "trying to frighten residents and their families," aiming "to destroy our jobs, our families and our neighborhoods," and "exploiting the elderly and their caregivers by lying, cheating and even law-breaking." JA1062-67, JA1028. Petitioners may have agreed to "furnish a bulletin board for posting of proper Union notices," JA1021, but they certainly did not agree to furnish the Union with a platform for broadcasting misleading and disparaging diatribes against petitioners under the guise of notifying employees about the commencement of adjudicatory proceedings.

That much is clear from Crutchfield's testimony about her actions toward past postings. As she explained, she repeatedly instructed the Centers to remove flyers that contained similarly derogatory, defamatory, or false information, such as flyers accusing petitioners of "reward[ing] dedicated staff" "[b]y kicking them out the door," of "robb[ing] employees of hundreds of hours of vacation time," and of having "no respect for … our residents," and a flyer contending that petitioners "want … to strip us of our rights, destroy our standards, cripple our ability to give quality care and turn our nursing home into a sweatshop." JA1053, JA1055-60,

41

JA1029.   These actions readily substantiate petitioners' explanation that they removed the "BUSTED" flyer because it was "derogatory and disparaging … and contain[ed] statements which are not accurate or truthful," JA1028, not because they were trying to silence the Union.

### C.   The Board's Conclusion That Petitioners' Actions Violated Section 8(a)(1) Is Legally Flawed and Factually Unfounded.

The Board's contrary conclusion is deeply mistaken.  At the outset, the Board analyzed this claim under the wrong legal framework.  According to the Board, petitioners' actions were unlawful because petitioners had no contractual right "to determine which Union notices were proper and to remove any notices or flyers [they] deemed improper."  JA1021.  But any claim related to the interpretation of the "proper Union notices" provision should have been brought under section 8(a)(5), or through the grievance procedure.  *See, e.g.*, *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993); *S & F Mkt. St. Healthcare LLC v. NLRB*, 570 F.3d 354, 355-58 (D.C. Cir. 2009); *Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 322 (D.C. Cir. 2003).  Because the only claim here was that petitioners violated section 8(a)(1), they were not required to prove that "the Union knew of [their] interpretation of [their] authority under the stated contract provision or acquiesced in that interpretation."  JA1021-22.  They were simply required to prove that the

flyer was removed pursuant to "a neutral policy of permitting only certain kinds of postings," *Loparex LLC*, 591 F.3d at 545, which petitioners plainly did.[5]

Indeed, even under section 8(a)(5), the Board has concluded that it is the general counsel's burden to prove that the term "proper" *has* been "liberally construed to permit any type of posting," not the employer's burden to prove that it *has not*. *W. Summit Flexible Packaging*, 310 N.L.R.B. 45, 54 (1993). Yet here, the Board started with the presumption that the term "proper" provided petitioners with no right whatsoever to restrict bulletin board access, and required petitioners to prove otherwise. That approach is incoherent. As the Board's own precedents make crystal clear, an employer has a right to "insist upon the imposition of limitations, restrictions, and regulations on" bulletin board access. *In re Stevens Graphics.*, 339 N.L.R.B. at 461. That is at the very least *presumptively* the right that petitioners reserved when they agreed to "furnish a bulletin board for posting of *proper* Union notices." JA1021 (emphasis added). The Board's contrary approach is tantamount to assuming that the term "proper" serves no purpose at all.[6]

---

[5] Moreover, to the extent the Union believed that petitioners' actions violated the CBAs, it was required to resolve that issue through the agreements' grievance procedure, which it did not do. JA1029; JA776; JA786-91; JA1375 ("Grievance Procedure"), JA1135, JA1183, JA1232, JA1281, JA1328.

[6] The Board's focus on whether petitioners' contractual right was "unilateral" is a red herring. The Union is free to challenge the manner in which petitioners apply the "proper" standard; it just must do so through the grievance procedure for which the parties bargained. *Cf. NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 837 (D.C. Cir. 1993)

To make matters worse, the Board imposed another unreasonably high and unrealistic burden on petitioners to overcome this misplaced presumption, insisting that they must demonstrate not only that they repeatedly have interpreted the term "proper" as giving them a right to dismiss derogatory, defamatory, and inaccurate materials, but that the Union has actually "acquiesced" in that interpretation. JA1021-22. The Board then concluded that petitioners did not satisfy this burden—even though they presented uncontroverted evidence the policy *had* been applied repeatedly to remove postings much like the one at issue here without ever drawing any objections from the Union. JA1022. The Board thus not only started from another presumption that is legally and factually unsustainable, but once again ignored evidence that should have been more than sufficient to rebut it, thus making the presumption nearly impossible to overcome.

### D. The Board's Remarkable Finding That the "BUSTED" Flyer Was Not Inaccurate, Derogatory, or Inflammatory Is Indefensible.

Finally, the Board's alternative conclusion that the "BUSTED" flyer actually *was* a "proper" union notice is nothing short of astounding. The four-paragraph flyer devoted all of a single sentence to informing employees that the Board's general counsel had filed an unfair labor practices complaint—and even that single sentence said nothing about the charges, but rather just hyperbolically accused petitioners of

---

("when the parties to a dispute have provided for arbitration, the Board will not begin an unfair labor practice proceeding until arbitration has run its course").

44

"massive violations of federal law." JA1062-67, JA1028. The rest of the "notice" was nothing more than an abusive and disparaging diatribe, accusing petitioners of, among other things, "lying, cheating" and "exploiting the elderly" in their "ruthless pursuit of more profit." JA1062-67, JA1028. The only thing more offensive than those baseless accusations is the Board's mystifying finding that they "cannot be considered inaccurate," "derogatory" or even "inflammatory." JA1033.

That finding certainly is not supported by the only two cases on which the Board relied. *Monongahela Power Co.*, 314 N.L.R.B. 65 (1994), involved a notice that merely referred to the dismissal of an employee and the potential for an unfair labor practice charge. *Id.* at 68. Likewise, *Roll & Hold Warehouse & Distribution Corp.*, 325 N.L.R.B. 41, 51 (1997), involved a newsletter that discussed a future negotiation session, allegations of favoritism with respect to certain work conditions, a "reference to future NLRB proceedings and a solicitation of employee complaints," and "a reputed quotation from Theodore Roosevelt." *Id.* at 48. That the innocuous postings removed in those cases did "not approach any reasonable concept of defamatory, profane, outrageous, or inflammatory language," *Monongahela Power Co.*, 314 N.L.R.B. at 69, says nothing one way or another about the categorically different posting at issue here.

Tellingly, the Board did not even attempt to draw any comparisons between the postings at issue in the cases it cited and the one at issue here. Nor did it attempt

45

to square its characterization of the "BUSTED" flyer with its past conclusions with regard to postings that actually *did* contain more comparable language. *See, e.g.*, *In re Stevens Graphics*, 339 N.L.R.B. at 461 (letters "accusing a 'member of management threatening to cut off any employees' fingers for deleting an original file'" and alleging "creative billing clearly are controversial and inflammatory and were lawfully restricted by the employer"); *cf. W. Summit Flexible Packaging*, 310 N.L.R.B. at 54 (no violation where employer refused to permit post of an unfair labor practice charge).

The Board instead portrayed petitioners' actions as akin to an attempt to "censor what the employees could and could not be told by the Union that represented them." JA1033. Once again, that reveals a basic failure to grasp the actual legal issue at hand. The question here is not whether a union is entitled to level derogatory accusations at an employer. It is whether a union is entitled to use the employer's *own bulletin board* to do so. As the Board's own precedents readily confirm, that is simply not the price of providing a union with a benefit to which it is not legally entitled. If it were, then employers surely would think twice before supplying unions with access to their bulletin boards in the first place.

\*     \*     \*

In short, the NLRA does not convert every neutral restriction on bulletin board access into an unfair labor practice. Instead, it prohibits employers only from

adopting bulletin board access policies that "discriminat[e] against union messages."

*Loparex LLC*, 591 F.3d at 545. Because there is simply no evidence—substantial or

otherwise—in the record to support a finding that petitioners were discriminating

against union messages, rather than enforcing their "neutral policy of permitting only

certain kinds of postings," *id.*, when they removed the derogatory and defamatory

"BUSTED" flyers from their own bulletin boards, the Board's conclusion that they

violated section 8(a)(1) cannot be sustained.

## CONCLUSION

For the reasons set forth above, petitioners respectively request that the Court

grant the petition for review, and vacate and deny enforcement of the Board's

decision and order.

Respectfully submitted,

s/PAUL D. CLEMENT

PAUL D. CLEMENT
ERIN E. MURPHY
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Petitioners HealthBridge Management, LLC, et al.*

October 16, 2014

47

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,102 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

Dated: October 16, 2014

s/William R. Levi
William R. Levi

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2014, I electronically filed the foregoing Opening Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

s/Paul D. Clement_____

Paul D. Clement
